## Clark's Adoption

*Dwight L. Gregory*, for petitioners.

*Al J. Kane*, for respondents.

*E. C. Marianelli*, for Luzerne County Institution District.

HOURIGAN, P. J., April 4, 1944.—This matter is now before the court upon petition of George Bittenbender and Alberta Bittenbender, his wife, for the adoption of Lee Clark, a son of Clarice Clark, who since the birth of her child has married Walter Stachera.

The mother refused to give her consent to the adoption. Petitioners proceeded upon the theory that her consent is unnecessary because she abandoned her child.

The Act of July 2, 1941, P. L. 229, secs. 1 and 2, provides inter alia that the petition for adoption "shall embody or have attached thereto the consents in writing. . . .

". . . in the case of an illegitimate child, the consent of the mother . . . but the consent of a parent, . . . who has abandoned the child, is unnecessary, provided such fact is proven to the satisfaction of the court . . ."

The question to be proven to the satisfaction of the court is:

Did Clarice Clark abandon her son Lee?

Clarice Clark, unmarried, and a resident of Hanover Township, this county, gave birth to a son, Lee, on June 21, 1942, at Florence Crittenden Home, Newark, N. J.

The child was brought by his mother to her parents' home in Hanover Township. Shortly afterward she contacted the Children's Service Center in the City of Wilkes-Barre and asked that institution to take her baby; that she wanted to give him for adoption. She was referred by the Children's Service Center to the Luzerne County Institution District. On August 25, 1942, Miss Clark called at the office of the institution district and met Miss Sandish, an employe of the district, who had been informed by the Children's Service Center of Miss Clark's desire to give her baby for adoption. At that time she informed Miss Sandish that she wanted to give her baby for adoption. Miss Sandish told her that the district could not take the baby until such time as a home could be found into which he could be placed. Miss Sandish made every effort to have Miss Clark keep her baby, going so far as to say that "situations like that [bieng the mother of an illegitimate child] are not considered a disgrace." To urgings to keep her baby the mother's answer was, in the words of Miss Sandish, 'She [the mother] told me she must give her baby away because her husband or her friend— the one she was going to marry—wouldn't marry her unless she gave up the baby."

The following day she again pressed the institution district to take her baby. Again two days thereafter she telephoned Miss Sandish and wanted to know when she was coming to take her baby away. The institution district turned the matter over to Mrs. Brague, one of its case workers, for investigation, with instructions to try and convince the mother that she should keep her child. Mrs. Brague called at the Clark home and, in the presence of the grandparents of the child, discussed the matter of giving up her child with Clarice. The first

question Clarice asked was, "You have come for the baby?" Mrs. Brague made an unsuccessful attempt to have the mother keep her baby. The grandmother wanted the mother to stay home and keep her child. The grandmother could not care for it because of illness. Clarice insisted that the baby be taken away for adoption, again stating that "she was in love with another man and he absolutely refused to marry her if she kept the baby." Finally Clarice said "I will not keep the baby."

Petitioners were contacted by the institution district and informed about the baby. With Mrs. Brague they went to the Clark home and met Mrs. Clark and Clarice. Mrs. Brague went into the house and asked, "Clarice, you have definitely decided you don't want the baby? You are going to give him up?" Clarice answered, "Absolutely." Mrs. Brague then said, "Clarice, when you give the baby up you will never be allowed to see it. You are giving it up for adoption. You are sure, because you will never see the baby again?" Clarice answered "Yes, I know it." The baby was given to Mrs. Bittenbender. Clarice gave her the baby's formula and some clothes.

Mrs. Bittenbender testified:

"A. It was my understanding I took him for adoption. I wouldn't have taken him otherwise.

Q. And Clarice understood that?

A. Yes, it was stated to her 'You can't have him back.'"

Petitioners took the child to their home on August 29, 1942, where he has remained until the present time. It is freely admitted that the child could not be with better people or in a more comfortable home.

Clarice returned to New Jersey where, on September 19, 1942, she executed the following agreement, which was sent by her to her parents, who in turn delivered it to the institution district.

"STATE OF NEW JERSEY,
COUNTY OF ESSEX.

"I, Clarice Clark, age 18, being duly sworn according to law, depose and say that I am the mother of Lee Clark, born on June 21, 1942, at Newark, New Jersey, who is now in the custody of the Luzerne County Institution District, Wilkes - Barre, Pennsylvania, that I hereby surrender my right as the natural mother and parent of the said child and hereby consent, with the approval, consent and ratification of my parents, Mary Clark and Russell Clark, to the placement of said Lee Clark for the purpose of adoption, and if the plan does not materialize to the best interest of the said child, I will accept him into my custody.

"(Signed)    CLARICE CLARK.

"Sworn and subscribed to before me
this 19th day of September, 1942.

"H. HENRY DITZELL,

"Notary Public of New Jersey.

"My commission expires Aug. 6, 1947.

"Witness: JADWIGA JUDD, Caseworker,
Social Service Bureau, Newark.

"We, Russell Clark and Mary Clark, parents of Clarice Clark, have ratified the foregoing giving consent for the adoption of our grandchild, Lee Clark, child of Clarice Clark, with the further provision that we will assume responsibility of said child upon default of· the mother, Clarice Clark, if the adoption plan does not materialize to the best interest of the child.

"Signed this 22nd day of September, 1942.

"(Signed)  RUSSELL F. CLARK,

"MRS. RUSSELL (MARY) CLARK.

"Witnesses:

"ELIZABETH SANDISH,

"MARJORIE BRAGUE."

The witness was her case (social service) worker in New Jersey. Her father and mother executed their

part of the agreement in the office of the institution district in Wilkes-Barre, on September 22, 1942.

Clarice, some time subsequent to her marriage, called Miss Sandish on the telephone.

"Q. What did she say?

A. She asked about Lee. She said, 'how is Lee?' and I said, 'You know he is all right. He is in a good home. Why? Do you want him back?' She said, 'Oh no' ".

Clarice married Walter Stachera on October 3, 1942; he was inducted into the Army on November 25, 1942. On July 12, 1943, after the baby had been in the Bittenbender home about 10½ months, Mrs. Brague notified Clarice personally that " the child was coming up for adoption." Clarice was of the opinion that he had been adopted. It was then that Clarice asked for a return of her baby. Thereafter her husband (who was not the father of the baby), in response to a letter sent him by the institution district, asked that the baby be returned to his wife. Clarice takes the position that she never gave her baby for adoption, but only for "child study". Her father testified that the baby was given for "child study". When asked by the court what "child study" was, he frankly admitted that he did not know. In fact, at the argument, counsel for Clarice admitted that he did not know what was meant or intended by "child study". We find that there was no talk about "child study" when the baby was given away by its mother. The mother now says that at the time she gave her baby to the Bittenbender family: "I was crazy—I didn't know what I was doing. I really didn't. I wanted to dispose of him for a certain length of time—until I could collect myself and make arrangements for my baby. The only arrangement was that way. I never really intended to give him up forever. After, when I signed the paper, I didn't understand it was for good, but just for child study".

The next questions asked by her counsel and her answers were:

224

"Q. At the time the child was being dressed or subsequently, when the child was dressed in the clothes brought by Mrs. Bittenbender, and before he was taken from your home, did anyone tell you that upon taking the child from the house you were surrendering all your rights to your child forever?

A. At that time, yes.

Q. But you say that statement was made to you by someone there present?

A. Yes, sir.

Q. And the child then was delivered to the Bittenbenders and taken by them to their home?

A. Yes."

Again she testified:

"Q. When did you receive the first knowledge or intimation that the Bittenbenders desired to adopt that child?

A. Well, the day they came down to take him away, they said they wanted him."

The child was born far away from her family, probably to hide the facts from neighbors and friends. After she brought it home her principal thought was how to give it away; how to be free of the burdens the baby brought upon her. She was in love with a man, not the child's father, whom she was anxious to marry. He would not marry her if she kept the child. She gave her child away on August 29, 1942, and married on October 3, 1942. The child, born on June 21, 1942, was given to the Bittenbenders August 29, 1942, but her agreement surrendering all rights to the child was not executed until three months thereafter. Certainly she was not crazy and without knowledge of what she was doing during this three-month period. Above love of her child was love of the man she married in less than two weeks after she in writing surrendered her baby to the world.

She, at the time, was a minor and her writing as a contract was not binding upon her, but we must con-

sider it as bearing upon the question of abandonment. It was admitted for that purpose.

We are not impressed with the position now taken by the husband of Clarice. Her chief reason for giving up her child for adoption was the fact that he would not marry her unless she did. His letter to the institution district professes too strongly his desire to have the child and his love for it, in view of the fact that he would not marry the mother unless she gave it away; that he saw it but once and never made any effort for nine months after his marriage to its mother to contact it by inquiry, gift, or otherwise.

Respondent's contention that the writing by which she surrendered her rights to her child was qualified is without merit. A reading of it shows that Clarice and her parents were not only ready and willing to give all parental rights to the child away, but that they were so obsessed with that desire that they agreed to be responsible for accepting liability for the little one if a placement of him could not be made.

In adoption proceedings, we must always have in mind that the welfare of the child is a matter of paramount importance in deciding to whom it shall be entrusted. After a most careful reading of the testimony and with full reflection of the parties and the witnesses as they were before us, we have no hesitancy in finding that the child's welfare will be best promoted by directing that he remain with petitioners.

We do not deem it necessary to quote from the many utterances of our appellate courts on the questions passed upon herein. They have all been fully covered by our courts.

The leading cases upon the subject are:

Commonwealth ex rel. Piper v. Edberg et ux., 346 Pa. 512; Hazuka's Case, 345 Pa. 432; Weinbach's Appeal, 316 Pa. 333; In re Adoption of Elizabeth McCann, 104 Pa. Superior Ct, 196.

Under the facts and the law, the court finds that Clarice Clark did abandon her son Lee.

The prayer of petitioners is granted.

## Decree

The court being satisfied that the statements made in the annexed petition are true, and the welfare of Lee Clark will be promoted by his adoption, and that all the requirement of the Act of April 4, 1925, P. L. 127, and supplements thereto, have been complied with, and in accordance with opinion this day filed:

The court, therefore, decrees that the said Lee Clark shall be in law the adopted child of George Bittenbender and Alberta Bittenbender, his wife, and shall have all the rights of a child and heir of said petitioners, and be subject to the duties of such child, and hereafter is named and known as Robert George Bittenbender.